IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


THOMAS ISAIAH BUNCH,
      Petitioner,

vs.                            Case No.:  3:17cv53/RV/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

     This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 15).  Petitioner filed a reply (ECF No. 17).

     The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 15).[1]  Petitioner was indicted in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-3040, on one count of first degree premeditated murder with a firearm, with actual possession and discharge of the firearm (Ex. B).  The victim was his grandfather.  Following a jury trial on July 17 and 18, 2013, Petitioner was found guilty as charged (Exs. B2, B3, B4, B5A).  On August 27, 2013, Petitioner was sentenced to a mandatory term of life in prison, with jail credit of 794 days (Ex. B5B).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-4398 (Exs. B5C, B6).  The First DCA affirmed the judgment per curiam without written opinion on November 13, 2014, with the mandate issuing December 2, 2014 (Exs. B8, B9).  Bunch v. State, 151 3o. 2d 1232 (Fla. 1st DCA 2014) (Table).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 15).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

On October 23, 2015, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. C1 at 1–13).  He subsequently filed an amended motion (*id.* at 16–21).  In an order rendered February 2, 2016, the state circuit court dismissed the motion for lack of a proper oath (*id.* at 23–24).  The dismissal was without prejudice to Petitioner's filing a second amended motion within 30 days (*id.*).  Petitioner filed a second amended motion on February 12, 2016 (*id.* at 25–32).  The state circuit court summarily denied it on May 2, 2016 (*id.* at 34–41).  Petitioner appealed the decision to the First DCA, Case No. 1D16-2653 (Ex. C2).  The First DCA affirmed the decision per curiam without written opinion on September 27, 2016, with the mandate issuing October 25, 2016 (Exs. C4, C5).  Bunch v. State, 202 So. 3d 408 (Fla. 1st DCA 2016) (Table).

Petitioner filed the instant federal habeas action on December 5, 2016 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding

th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. Williams, 529

U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has

emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning their
> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."   Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in state court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination

of the facts" standard is implicated only to the extent the validity of the state court's

ultimate conclusion is premised on unreasonable fact finding.  *See* Gill v. Mecusker,

633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause,

the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340,

123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based

on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."   Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id.; see, e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  See Cave v. Sec'y for Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision

was not premised on the trial court's unreasonable fact finding, and that the petitioner

failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an

insufficient factual basis for affirming the state court's decision." <u>Gill</u>, 633 F.3d at

1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA

and § 2254(d), does the court take the final step of conducting an independent review

of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the

writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 562 U.S. at

102.

Within this framework, the court will review Petitioner's claim.

III.    PETITIONER'S CLAIM

A.    <u>Ground One:  "Whether the Defendant was denied his Constitutional
rights to effective assistance of counsel and due process of law guaranteed by
Article I, Sections 9 and 16 of the Florida Constitution and the Sixth and
Fourteenth Amendments of the United States Constitution through Counsel's
misadvise [sic] and/or interference with his right to testify on his own defense
[sic] at trial."</u>

Petitioner alleges defense counsel advised him that he should not testify on his

own behalf, because the State would "make him look stupid" if he took the stand

(ECF No. 1 at 5–10). Petitioner contends this advice was unreasonable (*id.*). Petitioner alleges he was charged with killing his grandfather, and proceeded to trial with an insanity defense (*id.*).  Petitioner alleges if he had testified, the jury would have heard that he shot his grandfather because he believed his own life was in danger, that his grandfather was controlling his mind through black magic, and that he essentially had no choice but to kill his grandfather (*id.*).  Petitioner alleges the jury's finding of guilt was based only upon his statements during a videotaped interrogation, which showed that he was easily persuaded by his interrogators and provided whatever answers they wanted to hear (*id.*).  Petitioner alleges he was mentally incompetent at the time of the interrogation (*id.*).  Petitioner contends if the jury had heard him testify as to the reasons he killed his grandfather, he would have been convicted of a lesser included offense (*id.*).

Respondent asserts this ineffective assistance of trial counsel ("IATC") claim is "similar" to the claim Petitioner asserted in Ground One of his Rule 3.850 motion (ECF No. 15 at 6).  Respondent asserts that in the Rule 3.850 motion, Petitioner cited Strickland v. Washington, 466 U.S. 668 (1984) and the Sixth and Fourteenth Amendments; therefore, his federal claim was "arguably" exhausted in the state circuit court (*id.*).  But Respondent contends Petitioner abandoned the federal nature of his

claim in the post-conviction appeal by relying exclusively on state cases to support his claim (*id.*).  Respondent contends Petitioner's federal claim is thus unexhausted and procedurally barred (*id.* at 7–9).  Respondent contends  notwithstanding the procedural default, Petitioner is not entitled to relief, because the state courts adjudicated the merits of the claim, and Petitioner failed to establish that the adjudication was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of the facts (*id.* at 17–33).

The court rejects Respondent's exhaustion argument.  All of the claims presented in the post-conviction appeal were IATC claims, and Petitioner listed <u>Strickland</u> in the Table of Citations of his initial brief (Ex. C2 at iii).  In Petitioner's argument on Ground One, he argued that trial counsel's performance was deficient, and that he was prejudiced by the deficiency (*id.* at 3–5).  In support of his argument, he cited <u>Lott v. State</u>, 931 So. 2d 807, 819 (Fla. 2006), <u>Nelson v. State</u>, 126 So. 3d 1195, 1197 (Fla. 4th DCA 2012), and <u>Visger v. State</u>, 953 So. 2d 741, 744 (Fla. 4th DCA 2007), in which the Florida state courts decided IATC claims on federal grounds and expressly applied <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  This was sufficient to fairly present a federal IATC claim to the First DCA in the post-conviction appeal.  *See* <u>Baldwin v. Reese</u>, 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed.

2d 64 (2004) ("[A] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"). Having concluded that Petitioner exhausted his federal IATC claim, the court will determine whether Petitioner satisfied § 2254(d).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  Id. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  Id. at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir.

2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  <u>Strickland</u>, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317).   Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" <i>Id.</i> (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable

lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at

694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial

(instead of on appeal), Strickland prejudice is gauged against the outcome of the trial,

not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing

Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's

findings of historical facts in the course of evaluating an ineffectiveness claim are

subject to the presumption of correctness, while the performance and prejudice

components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier

v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar

is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.

As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The Strickland standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under Strickland with
> unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The question
> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

*Id.* (citations omitted).

2.    Federal Review of State Court Decision

Petitioner presented this IATC claim as Ground One in his Rule 3.850 motion

(Ex. C1 at 3–5).  In the state circuit court's written decision denying the claim, the

court correctly stated the deficient performance and prejudice prongs of the <u>Strickland</u>

standard as the applicable legal standard (*id.* at 35–36).  The court adjudicated the

claim as follows:

> In Defendant's first claim, Defendant alleges that his counsel was
> ineffective in his advice to Defendant not to testify on his own behalf.
> Defendant states that "it was imperative that the jury hear his side of the
> story, and observe him give his answers in order to determine if he was
> insane or not at the time of the incident."  Had he testified, he argues, the
> "jury would have heard from him personally that he actually believed
> that his grandfather controlled his mind; that his grandfather was casting
> spells on him on a daily basis; that his grandfather had told him that 'you
> will die in your bed while you sleep'; that he could not move out of the
> house because his grandfather would find him wherever he went; and,
> that he was afraid to eat any of the food in the house because he believed
> that it had been poisoned."  His counsel gave Defendant erroneous
> advice, according to Defendant, because he told him the prosecution
> would make him "look stupid" if he testified.
>
> The court inquired of Defendant regarding his choice about
> whether to testify.  Defendant indicated that he had spoken with his
> attorney, that he understood it was his decision alone about whether he
> should testify, and that he was satisfied with his attorney's presentation
> of the case.[FN 4:  Attachment 3, trial transcript excerpts, pages
> 161–163; 262–263.]  Because the advice cannot be considered factually
> incorrect, the Court does not find counsel's opinion that the State would

make Defendant "look stupid" if he testified to be deficient performance. Counsel is entitled, and indeed obligated, to advise Defendant regarding the potential pitfalls of cross-examination. Defendant was properly advised that and indicated that he understood that it was his decision alone whether he would testify. Lastly, Defendant does not demonstrate that the outcome would have been different had he chosen to testify. It appears that, had he testified, he would have simply repeated, in large part, the information he provided to police during the statement which was played for the jury.[FN 5: Attachment 3, trial transcript excerpts, pages 94–150.]  Defendant is not entitled to relief on this basis.

(Ex. C1 at 36–37). The First DCA affirmed the decision without written opinion (Ex. C4).

The state court's rejection of Petitioner's claim was reasonable. As previously discussed, Petitioner alleges that if he had testified, the jury would have heard that he shot his grandfather because he believed that his own life was in danger, that his grandfather was controlling his mind through black magic, and that he essentially had no choice but to kill his grandfather. However, the trial transcript demonstrates that the substance of Petitioner's proposed testimony was made known to the jury through Petitioner's own statements during the videotaped interrogation which was published to the jury.[2]

---

[2] The trial transcript was part of the state post-conviction record, as demonstrated by the circuit court's reference to it in its written order.

During Petitioner's interrogation by investigator Lee Tyree, Petitioner explained that, "my life was going to come to an end because of him [his grandfather]" (Ex. C1 at 68). Petitioner stated that his grandfather "likes to use magic — on people" (*id.* at 70–71). Petitioner stated, "I felt every single day of my life that I woke up I was going to die. And I'd come home, I go to sleep, I was going to die. I couldn't even smile anymore because if I was to smile I would die." (*id.* at 71). Petitioner stated that he wanted to be an architect, but his imagination "was used against me by magic and hexing" (*id.* at 71). Petitioner stated, "So I had to go to the hospital in order to find out that it really was him. And you can actually feel someone putting magic on you." (*id.* at 71–72). Petitioner stated, "I was used for magic." (*id.* at 72). He stated, "I guess he [his grandfather] was just trying to get my life to be too hard to live." (*id.* at 73). Petitioner stated, "it felt like my life was going to be taken away" (*id.* at 74). Petitioner stated that he felt that his grandfather was going to put a spell on him or his nieces, nephews, or sisters (*id.* at 77). Petitioner stated that his neighbor was also "involved with the hex" (*id.* at 90). Petitioner explained that his grandfather was trying to "set him up" with the neighbor, but "I didn't want to be set up and then be all magic" (*id.* at 91). Petitioner stated that when the police officers came to his house to arrest him, "it was a surprise . . . because it was real police

officers," and that he "just wanted to give them a hug or something" (*id.* at 96). When

asked if he regretted shooting his grandfather, Petitioner stated, "Well, I kind of don't

because I felt like I could have lost my life. . . . Because it didn't seem like that he

was going to stop, . . . And it felt like I was really getting close to the end of my life."

(*id.* at 97). Petitioner stated that his grandfather walked up to him, pointed his fingers,

and said, "With you I've got to use black magic" (*id.* at 98). Petitioner stated he

believed that if he ate or drank anything, he would be cursed (*id.* at 98–100). He

stated that his mother told him that his grandfather had killed a woman, and Petitioner

stated he thought that his grandfather killed women with magic (*id.* at 98–99).

Petitioner stated that when he shot his grandfather, "It was like it was all TV. . . . [I]t

didn't seem like it was real." (*id.* at 100). Petitioner stated, "You know, I was just

sitting there in the living room for the first time and I was like hearing some kind of

noises and things like that and I was like, you know, I didn't want nothing to happen."

(*id.* at 106–07).

   After publication of the videotaped interrogation, the court excused the jury for

a break. The court addressed Petitioner:

> THE COURT: Mr. Bunch, let me just inform you [that] you have
> a right to testify. That right is yours and yours alone. Do you
> understand that?

THE DEFENDANT: Yes.

THE COURT:  You'll make that decision in consultation with your attorney.  Do you understand that?

THE DEFENDANT:  (No audible response)

THE COURT:  He'll [defense counsel] talk about it and you'll tell me what you want to do okay?

THE DEFENDANT:  Okay.

THE COURT:  I understand we are not in your case [sic].  I understand we have got a lot of time, but I just want you to understand to think about your ability to testify.  Okay?

THE DEFENDANT:  All right.

THE COURT:  Mr. Bunch, if you testify I'm going to read this jury instruction:  The defendant in this case has become a witness.  You should apply the same rules to consideration of his testimony that you apply to the testimony of the other witnesses.

If you do not testify I'm going to read this jury instruction:  The defendant not testifying.  The Constitution requires the State to prove its accusations against the defendant.  It is not necessary for the defendant to disprove anything, nor is the defendant required to prove his innocence.  It is up to the State to prove the defendant's guilt by evidence.  The defendant exercised a fundamental right by choosing not to be a witness in this case.  You must not view this as an admission of guilt or be influenced in any way by his decision.  No juror should ever be concerned that the defendant did or did not take the witness stand to give testimony in the case.

Do you understand those two instructions?

THE DEFENDANT:  I do, sir.

THE COURT:  All right.  At some point we will have further talk.

(Ex. C1 at 112–14).

After the State rested its case, the jury heard testimony from two defense witnesses, Angela Savage, and defense expert, Dr. Brett Turner, a licensed psychologist, both of whom testified in support of Petitioner's insanity defense (Ex. B3 at 197–261).  Ms. Savage testified that she was the victim's daughter and Petitioner's mother (*id.* at 198).  Ms. Savage testified she was at the house where the shooting occurred from approximately 12:15–1:00 p.m. on the day of the shooting (*see id.* at 198, 208).  The shooting occurred just prior to 1:07 p.m. (*see* Ex. B2 at 82).  Ms. Savage testified that she spoke to her father, and then attempted to talk to Petitioner (*id.* at 199).  She testified, "[A]s I was trying to talk to him [Petitioner], . . . he was in a zone and didn't realize that I was there." (*id.*).  Ms. Savage explained:

> Well, I called my son over to the car and he was still just looking in a daze like he was in in a zone that he didn't even, like I said, didn't even know I was there.
>
> And so and then I grabbed him and I told him—I pulled him over to the car and I asked him to get into the car. . . .  And so as he got in the car, and then Cleo [Petitioner's grandfather] was steady looking at him and they were just —they were looking at each other and they was—like they both just at war with each other.

> Q [by defense counsel].  Did you try to do anything to prevent your son from staring at your father?
>
> A.  Yes.  I tried to grab my son.  I was talking to him and he still, like he didn't even know who I was.  And so then I took his face and I turned it towards me and for him to look at me, but it's like he still didn't even know I was even there.
> . . . .
> Q.  And after that did—did you have any more success in trying to get some kind of recognition from your son?
>
> A.  No.  As much as I was talking to him, he still—like he just didn't even know I was there.

(Ex. B3 at 200–01).

Ms. Savage testified that her father practiced voodoo and black magic, and always tried to "put a spell on people" (Ex. B3 at 202).  She testified that this hobby played a large part in his daily activities (*id.*).  Ms. Savage testified that a couple of years prior to the shooting, Petitioner was hospitalized for mental health treatment because he believed he "had a spell on him, a hex" (*id.* at 203).  She testified that Petitioner reported that he was seeing things and hearing things, and that demons were bothering him (*id.*).  Ms. Savage testified that Petitioner received medication and was released, but "it didn't help him all the way" (*id.*).  Ms. Savage testified that Petitioner stopped taking the medication because he could not afford to pay for it (*id.* at 204).

Ms. Savage testified that her father had a long snake in the screen door of the house, white powder around the door, beads all over the house, and candles (*id.* at 205).

Dr. Turner testified that he evaluated Petitioner, and as part of his evaluation he interviewed Petitioner twice, reviewed Petitioner's mental health records, reviewed the videotaped interrogation, and reviewed evaluations by three other doctors (Ex. B3 at 240). Dr. Turner testified that according to Petitioner's records, he was diagnosed with paranoid schizophrenia and psychosis (*id.* at 241). Dr. Turner testified that he evaluated Petitioner's sanity at the time of the shooting, and concluded that Petitioner was not sane at the time of the shooting (*id.* at 241–42). Dr. Turner explained his conclusion as follows:

> [U]sing the criteria, the Florida criteria for insanity, first off, Mr. Bunch meets the criteria for paranoid schizophrenia which is a mental disease, a psychiatric illness and because of his condition—basically, the problem is he's exhibiting several different symptoms of psychosis at the time of the offense including visual and auditory hallucinations of demons basically. He also was under the paranoid delusional thinking that his grandfather was going to take his life using black magic on him, and then basically just his overall mental status was impaired and altered, not thinking clearly. And so the second prong, because of his condition, he did not know the consequences or did not know what he was doing or his consequences, or he didn't know the—that the act was wrong, basically. And I think—in a general sense, I think the defendant knew murder is wrong. I don't think there is any question about that. But the problem comes in is that he's basically was thinking that he had to do that, otherwise his grandfather was going to kill him. And so the second prong of the insanity definition is met, too.

(Ex. B3 at 242–43).  When asked whether Petitioner had a "psychotic break" at the

time of the shooting, Dr. Turner testified that Petitioner had indeed reached his

"breaking point":

> [H]e's resisting, resisting the demons up until a point that it's just
> psychologically overwhelming for him.  He doesn't have any other
> adaptable or copping [sic] mechanism, you know, to resist them any
> more.  They are overwhelming him.
>
> Psychotic break is not something we say in clinical terms, but it's
> more or less a layman's term, but certainly that's what happens when a
> person becomes overwhelmed and finally succumbs to the psychosis.

(*id.* at 246).  Dr. Turner testified Petitioner knew that murder was wrong in a general

sense, but he was "trying to get his grandfather to stop putting black magic on him so

that was his way of self-defense or defending himself against the black magic" (*id.* at

247).  Dr. Turner testified that Petitioner actually believed that there were demons

telling him what to do, that the demons were real and "coming after him"; and that his

grandfather was using black magic to cause that to happen (*id.*).  Dr. Turner testified

that Petitioner truly believed that his grandfather was going to kill him with black

magic (*id.* at 247–48).  Dr. Turner testified that, based upon Petitioner's psychosis,

Petitioner absolutely believed he was doing the right thing for himself (*id.* at 248).  Dr.

Turner testified that Petitioner was not acting with a logical thought process, and was

instead acting under the delusion that his grandfather was about to kill him with black

magic (*id.* at 248–49).

After Dr. Turner testified, and outside the presence of the jury, the Court

inquired as to whether Petitioner wished to testify:

> THE COURT:  Mr. Bunch, I spoke with you yesterday about your decision and it is your decision alone to testify.  Do you understand that?

> THE DEFENDANT:  Yes.

> THE COURT:  Have you spoken with your attorney about your ability to testify here today?

> THE DEFENDANT:  Yes, I spoke to him.

> THE COURT:  Is it your decision that you do not wish to testify?

> THE DEFENDANT:  That's right.

> THE COURT:  Are you satisfied with your attorney's presentation of your case?

> THE DEFENDANT:  Yes.

(Ex. C1 at 116–17).

The state court reasonably concluded that Petitioner failed to show the outcome

of trial would have been different if he had chosen to testify, because Petitioner's

proposed testimony was in large part cumulative of information presented to the jury

through Petitioner's own statements during the interrogation, and Dr. Turner's

testimony.  *See, e.g.*, <u>Cain v. Sec'y, Fla. Dep't of Corr.</u>, 266 F. App'x 854, 856–57 (11th Cir. 2008) (unpublished but recognized as persuasive authority) (even if murder defendant's decision not to testify resulted from professionally unreasonable advice from counsel, defendant was not prejudiced by such advice, as required for ineffective assistance of counsel claim; defendant's proposed testimony was made known to the jury through cross-examination of another trial witness).  Additionally, if Petitioner testified at trial, he would have been subject to cross-examination by the prosecutor, which may have resulted in the jury's hearing testimony that was damaging to Petitioner's insanity defense.

Petitioner failed to demonstrate that the state court's adjudication of his IATC claim was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14th day of May 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**